IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14-cv-178

| | | |
|---|---|---|
| JEFF BENTON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | COMPLAINT |
| v. | ) | (Jury Trial Demanded) |
| | ) | |
| BIOMET ORTHOPEDICS, LLC, | ) | |
| BIOMET, INC. & BIOMET, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

NOW COMES the Plaintiff, Jeff Benton, by and through his attorneys, and for his causes of action, brings suit against the Defendants, Biomet Orthopedics, LLC; Biomet, Inc.; and Biomet, LLC, stating and averring as follows:

## INTRODUCTION

1. This is a product liability case involving a defective hip implant system. Plaintiff Jeff Benton had a Biomet M2a Magnum Metal-on-Metal Hip System ("M2a Magnum Hip System") implanted in his hip. The M2a Magnum Hip System is defective because excessive amounts of cobalt and chromium corrode and wear from the surfaces of the acetabular cup, the femoral head, and the taper sleeve. The excessive wear in turn causes the hip implant to fail and the surrounding tissue and bone to die. As a result of these defects, Mr. Benton's M2a Magnum Hip System failed in his body, causing metallosis, fluid build up, tissue and bone destruction, and the need for Mr. Benton to undergo a complicated and risky surgery to remove and replace the defective implant.

## PARTIES

2. Plaintiff Jeff Benton is a citizen of the United States and a resident of the

State of North Carolina. Mr. Benton's home address is 6814 Pine Lane, Union County, Monroe, North Carolina.

3.      On information and belief, Defendant Biomet Orthopedics, LLC is a limited liability corporation organized and existing under the laws of the state of Indiana with its principal place of business in Warsaw, Indiana. Biomet Orthopedics, LLC designed, manufactured, marketed, promoted, and sold the M2a Magnum Hip system that is the subject of this lawsuit. Biomet Orthopedics, LLC does not maintain a principal local office in North Carolina, but can be served at 56 East Bell Drive, P.O. Box 587, Warsaw, Indiana 46581-0587.

4.      On information and belief, Defendant Biomet, Inc. is a corporation organized and existing under the laws of the state of Indiana with its principal place of business in Warsaw, Indiana. Biomet, Inc. designed, manufactured, marketed, promoted, and sold the M2a Magnum Hip system that is the subject of this lawsuit. Biomet, Inc. does not maintain a principal local office in North Carolina, but can be served at 56 East Bell Drive, P.O. Box 587, Warsaw, Indiana 46581-0587.

5.      On information and belief, Defendant Biomet, LLC is a limited liability corporation organized and existing under the laws of the state of Indiana with its principal place of business in Warsaw, Indiana. Biomet, LLC designed, manufactured, marketed, promoted, and sold the M2a Magnum Hip system that is the subject of this lawsuit. Biomet, LLC does not maintain a principal local office in North Carolina, but can be served at 56 East Bell Drive, P.O. Box 587, Warsaw, Indiana 46581-0587.

6.      At all times mentioned, each of Biomet Orthopedics, LLC, Biomet, Inc., and Biomet LLC was the representative, agent, employee, joint venturer, or alter ego of each of the

other entities and in doing the things alleged herein was acting within the scope of its authority as such. Specifically, each Defendant was but an instrumentality or conduit of the other in the prosecution of a single venture, namely, the design, promotion, and sale of the M2a Magnum Hip System. Therefore, it would be inequitable for any Defendant to escape liability for an obligation incurred as much for that Defendant's benefit as for the other.

7. Biomet Orthopedics, LLC, Biomet, Inc., and Biomet LLC are collectively referred to herein as "Biomet."

## JURISDICTION AND VENUE

8. This is a civil action of which this Court has original jurisdiction under 28 U.S.C. section 1332 because it is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of costs and interest.

9. Venue is proper pursuant to 28 U.S.C. §1391(c) because Defendants are all corporations that have substantial, systematic, and continuous contacts in this District and they are all subject to personal jurisdiction in this District. Moreover, the Plaintiff's injuries occurred in this District.

## FACTUAL BACKGROUND

**A. The M2a Magnum Hip System Is Defective And Was Not Adequately Tested**

10. The hip joint is where the femur connects to the pelvis. The joint is made up of the femoral head (a ball-like structure at the very top of the femur) rotating within the acetabulum (a cup-like structure at the bottom of the pelvis.) In a healthy hip, both the femur and the acetabulum are strong and the rotation of the bones against each other is cushioned and lubricated by cartilage and fluids.

11. A total hip replacement replaces the body's natural joint with an artificial one, usually made out of metal and plastic. A typical total hip replacement system consists of four separate components: (1) a femoral stem (labeled as "hip implant" in the diagram to the left), (2) a femoral head, (3) a plastic (polyethylene) liner, and (4) an acetabular shell. After the surgeon hollows out a patient's femur bone, the femoral stem is implanted. The femoral head is a metal ball that is fixed on top of the femoral stem. The femoral head forms the hip joint when it is placed inside the polyethylene liner and acetabular shell.



12. While most hip replacements use a polyethylene plastic or ceramic acetabular liner, Biomet's M2a Magnum Hip System has a critical difference: it is a monoblock system which does not have an acetabular liner. Instead, the M2a Magnum Hip System forces metal to rub against metal with the full weight and pressure of the human body. Because of Biomet's defective design for the M2a Magnum Hip System, hundreds of patients—including Mr. Benton—have been forced to undergo surgeries to replace the failed hip implants.

13. The M2a Magnum Hip System suffers from a design or manufacturing defect that cause excessive amounts of cobalt and chromium to wear and corrode from the surface of the acetabular cup, from the femoral head, and from the taper adapter. These cobalt and chromium fragments prompt the body to react by rejecting the hip implant. This rejection often manifests

with symptoms of pain, looseness, dislocation, and squeaking and popping sounds. Inside the hip joint, the metal reaction often causes fluids to accumulate and soft tissues and bone to die.

14. The design of the M2a Magnum Hip System was not sufficiently tested by Biomet, and it was never approved by the FDA as being safe or effective for the products' intended purpose.

15. On numerous occasions, Biomet met with orthopedic surgeons in cities throughout the United States to promote the M2a Magnum Hip Implant. At some or all of these meetings, a representative or representatives of Biomet was present. During these meeting, Biomet assured the orthopedic surgeons that the M2a Magnum Hip System was safe, was the best product on the market, had an excellent track record and a low and acceptable failure rate. Biomet continued to "defend" the M2a Magnum Hip Implant even after they became aware of numerous and serious complications with the M2a Magnum Hip System. Biomet did not reveal (and instead concealed) their knowledge of numerous and serious complications and other "bad data" during their meetings with orthopedic surgeons.

B.   **Biomet Sold the M2a Magnum Hip Implant To Mr. Benton After It Knew It Was Defective, That It Had Injured Others, And That It Would Injure Him.**

16. It was not long after Biomet launched the M2a Magnum Hip System that reports of failures began flooding into Biomet. For example, in August 2004, Biomet received a complaint that a patient had to undergo a surgery to remove and replace an M2a Magnum Hip System because it had become loose after only three years. Biomet closed its investigation of this complaint.

17. Biomet would go on to receive hundreds of similar complaints reporting that the

M2a Magnum Hip System had failed and that the failure had forced patients to undergo painful and risky surgeries to remove and replace the failed hip component. To date, more than 350 reports of adverse events associated with the M2a Magnum Hip System have been filed with the FDA.

18. By the time Biomet sold the M2a Magnum Hip System to Plaintiff in October 2008, numerous reports had been filed with the FDA reporting an adverse event associated with the M2a Magnum Hip System. Consequently, Biomet was fully aware that the M2a Magnum Hip System was defective and that dozens of patients already had been injured by that defect. Based on this information, Biomet should have recalled the M2a Magnum Hip System before it was sold to Mr. Benton. At minimum, Biomet should have stopped selling the defective implant when it became aware that it had catastrophically failed in several patients.

19. Despite its knowledge that the M2a Magnum Hip System had a defect and that it had failed hundreds of times, causing hundreds of patients to undergo the agony of another surgery, Biomet continues to sell the defective M2a Magnum Hip System. In so doing, Biomet actively concealed the known defect from doctors and patients—including Mr. Benton and his doctor—and misrepresented that the M2a Magnum Hip System was a safe and effective medical device.

20. As numerous failures of the M2a Magnum Hip Implant were reported to Biomet, it continued to actively promote, market and defend the defective products. For example, Biomet published marketing brochures touting the safety and durability of metal-on-metal implants and specifically, the M2a Magnum Hip System. These brochures were given to doctors around the world to encourage them to use the M2a Magnum Hip System.

21. Despite its knowledge that the M2a Magnum Hip System was defective, Biomet also made several false representations about specific design elements of the M2a Magnum Hip System that they claimed made it superior to other more safe hip implants on the market. For example, Biomet said:

- "The M2a-Magnum™ Large Metal Articulation System offers optimal joint mechanic restoration and ultra low-wear rates in vivo."
- Many studies conducted over the last several decades have shown no definitive correlation of negative health issues to ion levels exhibited from metal-on-metal implants."

22. Biomet's reason to conceal the defect in its M2a Magnum Hip System is clear. Hip implant sales are critically important to Biomet, and the M2a Magnum is one of its most profitable products. During the time period relevant to this Complaint, Biomet's management was trying to make Biomet look appealing to investors, and they ultimately were purchased by a private equity firm in 2007 for $10 billion. Biomet was faced with a critical defect in one of its most profitable hip implant systems. The last thing Biomet wanted to do was to admit that these popular products had a critical defect that could cause a premature failure, forcing patients to have to undergo another painful surgery. Focused on corporate profits, and at the expense of patient safety, Biomet decided that it would continue to promote, market, and sell the M2a Magnum Hip System despite the fact that it knew the product was defective. To this day, Biomet continue to sell these defective implants to unsuspecting patients without any warning about the risks or the failures that have been reported to the company.

7

C.  **Mr. Benton's M2a Magnum Hip System Was Defective And Failed, Forcing Him To Undergo An Additional Painful And Risky Surgery.**

23. On or about October 20, 2008, Plaintiff underwent a left hip replacement surgery in Leesburg, Florida, during which a Biomet metal-on-metal Magnum prosthesis was implanted in his body. By this time, numerous reports of adverse events associated with the M2a Magnum had been filed with the FDA and Biomet knew that the product was defective. Biomet failed to disclose that information to Mr. Benton, his physicians, or the public. Upon information and belief, Biomet misrepresented to Mr. Benton and his orthopedic surgeon through its sales representatives that the M2a Magnum Hip System was safe and effective. In reliance on these representations, Mr. Benton' orthopedic surgeon made the decision to use the M2a Magnum Hip System. If it were not for the misrepresentations made by Biomet, Mr. Benton' orthopedic surgeon would not have used the M2a Magnum Hip System in Mr. Benton' hip replacement surgery.

24. By 2013, Plaintiff was residing in North Carolina and began experiencing pain in his left hip.

25. By 2013, the pain had become severe and he developed a large fluid collection.

26. Upon the advice of his physician, Mr. Benton agreed to have his metal-on-metal prosthesis removed and replaced using a prosthesis using polyethylene or ceramic components.

27. On August 27, 2013 in North Carolina, Plaintiff underwent a complex, risky, and painful surgery (known as a "revision surgery") to remove the failed M2a Magnum Hip System from his body. Revision surgeries are generally more complex than the original hip replacement surgery, often because there is a reduced amount of bone in which to place the new hip implants.

Revision surgeries also usually take longer than the original hip replacement surgery and the revision surgery has a higher rate of complications. Post-surgical pathology reports indicated that the acetabular head and lining were surrounded by fibroconnective tissue and bone with necrosis, granulation, acute and chronic inflammation. During the surgery, metalosis fluid and a pseudo tumor was found in Plaintiff's joint.

28. As a result of the defective design, manufacture and composition of the M2a Magnum Hip System, and its accompanying warnings and instructions (or lack thereof), Mr. Benton's hip implant failed, causing his severe pain.

29. Having to go through a revision surgery has subjected Mr. Benton to much greater risks of future complications than she had before the revision surgery. For example, several studies have found that a revision surgery causes a much higher risk of dislocation compared with an original hip replacement surgery. In one study conducted by Charlotte Phillips and his colleagues at Brigham and Women's Hospital in Boston, 14.4 percent of patients who underwent a revision surgery suffered from a dislocation compared with 3.9 percent of patients who underwent a original hip replacement surgery. In other words, hip replacement patients who have undergone a revision surgery are almost four times more likely to suffer from a hip dislocation than those who have not. (Phillips CB, et al. Incidence rates of dislocation, pulmonary embolism, and deep infection during the first six months after elective total hip replacement. American Journal of Bone and Joint Surgery 2003; 85:20–26.)

30. As a direct and proximate result of the failure of his defective M2a Magnum Hip System and Biomet's wrongful conduct, Mr. Benton sustained and continues to suffer economic damages (including medical and hospital expenses), severe and possibly permanent

9

injuries, pain, suffering and emotional distress. As a result, Mr. Benton has sustained and will continue to sustain damages in an amount to be proven at trial, but which will far exceed $75,000 jurisdictional minimum of this court.

## FRAUDULENT CONCEALMENT

31. Defendants' failure to document or follow up on the known defects in their product, and concealment of known defects, constitutes fraudulent concealment that equitably tolls applicable statutes of limitation.

32. Defendants are stopped from relying on the statute of limitations defense because Defendants actively concealed the defects, suppressing reports, failing to follow through on FDA notification requirements, and failing to disclose known defects to physicians. Instead of revealing the defects, Defendants continued to represent their device as safe for its intended use.

33. Defendants are and were under a continuing duty to disclose the true character, quality, and nature of risks and dangers associated with their device. Because of Defendants' concealment of the true character, quality and nature of the product, Defendants are stopped from relying on any statute of limitations defense.

34. Defendants furthered this fraudulent concealment through a continued and systematic failure to disclose information to the Plaintiff, his physician and the public.

35. Defendants' acts before, during and/or after the act causing Plaintiff's injuries prevented Plaintiff from discovering the injuries or cause thereof.

36. Defendants' conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Defendants must have realized was dangerous, heedless and reckless, without regard to the consequences or the rights and safety of the Plaintiff.

## COUNT I
## (Negligence)

37.     Plaintiff incorporates all of the preceding paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

38.     At all times herein mentioned Biomet had a duty to exercise reasonable care and to comply with the existing standards of care in the design, manufacture, testing, inspection, labeling, promotion, marketing, and sale of the M2a Magnum Hip System to ensure that it would be safely used in a manner and for a purpose for which it was made.

39.     In violation of its obligation to exercise due care and comply with existing standards of care, Biomet was negligent in the design, manufacture, testing, inspection, labeling, promotion, marketing, and sale of the M2a Magnum Hip System.

40.     In further violation of the duties set forth above, Biomet negligently made misrepresentations about the safety and effectiveness of the M2a Magnum Hip System to Plaintiff and his orthopedic surgeon. In reliance on these misrepresentations, Plaintiff's orthopedic surgeon decided to use the M2a Magnum Hip Implant in Plaintiff's surgery. If it was not for the misrepresentations by Biomet, Plaintiff's orthopedic surgeon would not have used the M2a Magnum Hip System in Plaintiff's surgery, and Plaintiff would not have been injured in the manner set forth with particularity, above.

41.     In further violation of the duties set forth above, Biomet negligently failed in their duty to exercise reasonable care in the provision of an adequate warning to Mr. Benton and his physicians as to the risks of the M2a Magnum Hip System.

42.     In further violation of the duties set forth above, Biomet negligently failed to

11

exercise reasonable care in the post-marketing warnings as to the risks of the M2a Magnum Hip System when they knew or should have known of said risks.

43. As a proximate cause of Biomet's wrongful conduct, Plaintiff suffered injuries and damages as alleged herein.

## COUNT II
### (Breach of Implied Warranties)

44. Plaintiff incorporates all of the preceding paragraphs of this Complaint as if fully set forth here and further alleges as follows:

45. Prior to the time that the M2a Magnum Hip System was used by Mr. Benton, Biomet impliedly warranted to Mr. Benton and his physicians that the M2a Magnum Hip System was of merchantable quality and safe and fit for the use for which it was intended.

46. Mr. Benton and his physician were and are unskilled in the research, design and manufacture of the M2a Magnum Hip System, and they reasonably relied entirely on the skill, judgment and implied warranty of Biomet in using the M2a Magnum Hip System.

47. The M2a Magnum Hip System was neither safe for its intended use nor of merchantable quality, as warranted by Biomet, in that it had dangerous propensities when put to its intended use and would cause severe injuries to the user.

48. Biomet, by selling, delivering and/or distributing the defective M2a Magnum Hip System to Mr. Benton, breached the implied warranty of merchantability and fitness and caused Mr. Benton to suffer severe pain and emotional distress, incur medical expenses and incur a loss of earning capacity.

49. Plaintiff, within a reasonable time after the occurrence and breach complained of,

notified and informed Defendants of their breach as required by N.C. Gen. Stat. section 25-2-607(3).

50. As a result of the aforementioned breach of implied warranties by Biomet, Plaintiff suffered injuries and damages as alleged herein.

## COUNT III
### (Breach of Express Warranty)

51. Plaintiff incorporates all of the preceding paragraphs of this Complaint as if fully set forth here and further alleges as follows:

52. At all times herein mentioned, Biomet expressly warranted to Mr. Benton and Mr. Benton' physicians, by and through statements made by Biomet or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that the aforementioned M2a Magnum Hip System was safe, effective, fit and proper for its intended use.

53. In utilizing the aforementioned M2a Magnum Hip System, Mr. Benton and his physician relied on the skill, judgment, representations and foregoing express warranties of Biomet.

54. Said warranties and representations were false in that the aforementioned M2a Magnum Hip System was not safe and was unfit for the uses for which it was intended.

55. As a result of the foregoing breach of express warranties by Biomet, Plaintiff suffered injuries and damages as alleged hassan.

## COUNT VI
### (UNFAIR AND DECEPTIVE TRADE PRACTICES)

56. Plaintiff incorporates by reference all of the paragraphs of this Complaint as if

13

fully set forth herein at length, and further alleges:

57. Defendants represented that the hip system, and specifically, the hip system purchased or used by the Plaintiff, would be free from defects and fit for its intended purpose, under normal conditions of use, wear and exposure.

58. Defendants marketed and represented that the hip system contained a superior design, was a true value, and was otherwise safe for use in the application used for the Plaintiff.

59. Defendants knew or should have known that the hip system did not or would not conform to Defendant's representations and promises.

60. By making these false and misleading misrepresentations and omissions, and by concealing the true facts from the Plaintiff and his doctors, the Defendants intended that the Plaintiff and his doctors would rely on its false statements and material omissions, and intended to induce the Plaintiff and his doctors to purchase and use the hip system.

61. The Defendants' unfair and deceptive conduct, as herein alleged, occurred in the course of the sale of a good, to wit, the hip system, and was in or affecting commerce, for the purpose of establishing liability under Chapter 75 of the North Carolina General Statutes.

62. Based upon Defendants' misrepresentations, material omissions, and business practices, Plaintiff and his doctors believed that Defendants were selling and providing a safe and reliable hip system for use in plaintiff's surgery. Furthermore, Defendant's practices, as alleged hassan, are such that reasonable patients and their doctors, would likewise believe that the hip system would be free from defects and fit for its intended purpose under the conditions of use to which it was being put.

63. Upon information and belief, the Defendants' unfair and deceptive representations

14

and omissions regarding the hip system, as herein alleged, are all pursuant to policies, practices and procedures created and adopted by Defendants, and implemented throughout the United States and North Carolina by Defendants.

64. Defendants' misrepresentations, material omissions, and business practices, as alleged in this Complaint, constitute unfair and/or deceptive acts or practices in violation of the provisions of Chapter 75 of the North Carolina General Statutes.

65. Defendants' misrepresentations, concealment, and unfair and deceptive acts or practices proximately caused injury to the Plaintiff.

66. Plaintiff is entitled to receive compensation for these injuries, in an amount to be determined at trial.

67. As a direct and proximate result of Defendants' unfair and/or deceptive acts and practices, in or affecting commerce, Plaintiff is entitled to recover treble damages from Defendants, pursuant to N.C. Gen. Stat. 75-16, and to recover his reasonable attorneys fees as provided for in N.C. Gen. Stat. 75-16.1.

**PUNITIVE DAMAGES**

68. Defendants' conduct, as described above, was done with actual malice, that is, evil motive, intent to injure, ill will and/or fraud. Defendants risked the lives of consumers and users of their products, including the Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants by and through their officers and manager made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public, all to the detriment of the purchasers of the product, generally, and Jeff Benton, in particular.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment, jointly and severally, against the Defendants for the following:

1. Past and future medical, permanency and incidental expenses, according to proof;

2. Past and future general damages for pain and suffering, according to proof;

3. Punitive and exemplary damages in an amount to be determined at trial;

4. Prejudgment and post judgment interest;

5. Costs to bring this action; and

6. Such other and further relief as the court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues raised herein.

Respectfully submitted this the 11th day of April, 2014.

LAW OFFICE OF MICHAEL W. PATRICK

BY:   /s/ Michael W. Patrick
         N.C. Bar #7956
         312 West Franklin Street
         Post Office Box 16848
         Chapel Hill, North Carolina 27516
         mpatrick@ncproductslaw.com
         (919) 960-5848  (919) 869-1348 - fax